UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CRYSTAL SHORE et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 25-11232-LTS |
| DOREL JUVENILE GROUP, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

MEMORANDUM AND ORDER ON MOTION TO DISMISS (DOC. NO. 27)

July 16, 2026

SOROKIN, J.

This putative class action arises from Dorel Juvenile Group, Inc.'s marketing and sale of

allegedly defective car seats under its Safety 1st brand.  Dorel moved to dismiss all claims or,

alternatively, to strike the class action allegations.  Doc. No. 27.[1]  For the reasons that follow, the

motion to dismiss is ALLOWED IN PART and DENIED IN PART, and the motion to strike is

DENIED WITHOUT PREJUDICE.

I.    FACTS[2]

Dorel Juvenile Group, Inc., is a Massachusetts corporation that manufactures and sells

products for infants and children under several brand names, including "Safety 1st."  Doc. No.

---

[1] Citations to "Doc. No. __" reference items appearing on the Court's electronic docketing
system ("ECF"); pincites are to the page numbers in the ECF header or, for documents
enumerated by paragraph, to paragraph numbers.

[2] The Court draws the following facts from the first amended complaint, Doc. No. 13, accepting
all well-pleaded facts and drawing all reasonable inferences in Plaintiffs' favor, as it must on a
motion to dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The Court also considers
"(a) implications from documents attached to or fairly incorporated into the complaint, (b) facts
susceptible to judicial notice," including "matters of public record," and "(c) concessions in a

13 ¶¶ 25–26.  Dorel represents itself as a "leader in juvenile care" whose role "is to empower parents on their journey" by helping them bring "safety and care" to their families.  Id. ¶ 27.  As an industry leader, Dorel "conducts significant market research and knows consumers will pay more for baby products advertised as 'safe' for their children to use."  Id. ¶ 8.

Under its Safety 1st brand, Dorel manufactures, markets, and sells child-safety products. Id. ¶ 37.  Dorel's marketing for this brand emphasizes "safety": the label "Safety 1st" is placed prominently on its car seats, and its website features statements like, "The road ahead is comfortable and secure when your little one rides in a Safety 1st car seat," and, "Choose from convertible, booster and infant car seats that are designed to provide protection for your little one, so you can take comfort in knowing that your child is riding safe."  Id. ¶¶ 19, 38.  Industry participants—particularly leaders, like Dorel—"know safety is paramount for consumers of baby and infant products."  Id. ¶ 53.

At issue is Dorel's Safety 1st Grow and Go Sprint Car Seat.  Id. ¶ 2.  The car seat was sold directly through Safety 1st's website as well as by retailers like Walmart, Target, and Amazon.  Id. ¶¶ 48–49 & n.18.  Consumers paid, on average, about $150 for the car seat.  Id.

Certain models of this car seat were defective: the headrest cover could be easily removed by infants and young children, exposing foam that the children could (and in some cases did) break off and place in their mouths, thereby posing a choking hazard.  Id. ¶¶ 3, 10, 32, 41–42.  Dorel received at least thirteen reports of children placing the car seat's headrest foam in their mouths.  Id. ¶ 42; see also Thousands of Safety 1st Car Seats Recalled for Choking Hazard, Consumer Reps. (Apr. 25, 2025), https://www.consumerreports.org/babies-kids/baby-product-

---

plaintiff's response to the motion to dismiss."  Newman v. Krintzman, 723 F.3d 308, 309 (1st Cir. 2013) (citation modified).

recalls/safety-1st-car-seat-recall-grow-and-go-sprint-a9053668687/ [https://perma.cc/XEJ7-Q4UD], cited in Doc. No. 13 ¶ 42 n.15.  Plaintiffs allege that the defect was also known to Dorel based on its online product reviews.[3]  Doc. No. 13 ¶ 33.  The defect would have been revealed to Dorel had it "adequately tested" the car seats.  Id. ¶ 63.

The amended complaint does not specify when Dorel received the thirteen consumer reports.  The public report from the National Highway Traffic Safety Administration ("NHTSA"), submitted by Dorel and relied on by Plaintiffs' counsel during oral argument, provides more detail.  Doc. No. 28-3.  The NHTSA report states that Dorel received notice of "the first case of a child placing foam into their mouth in June 2023," and then received three additional reports in October 2023.  Id. at 3.  Thereafter, Dorel "continued to monitor this issue and include foam in the mouth cases in quarterly [Early Warning Reporting ("EWR")] reports."  Doc. No. 28-3 at 3.  On December 30, 2024, NHTSA's Office of Defects Investigation ("ODI") "contacted Dorel requesting additional information."  Id.  In the spring of 2025, ODI and Dorel met several times to review the car seat's headrest design and discuss concerns.  Id.

On April 18, 2025, in conjunction with NHTSA, Dorel voluntarily recalled its Safety 1st Grow and Go Sprint Car Seats that were manufactured between February and December 2023.  Doc. No. 13 ¶¶ 5, 43; see also Safety 1st Grow and Go Sprint (Model CC321) Voluntary Recall, Safety 1st, https://safety1st.com/pages/safety-1st-grow-and-go-sprint-model-cc321-voluntary-recall?_pos=1&_sid=470003e3e&_ss=r [https://perma.cc/P7TU-FUTF] (last visited July 6,

---

[3] The screenshot Plaintiffs include shows that the car seat had three reviews on the Safety 1st website, with an average rating of 2.3 out of 5 stars and only one of the three reviewers recommending the product.  Doc. No. 13 ¶ 33.  The reviews themselves are not included.  Three photos are, but none clearly shows the detached headrest or exposed foam.  It is therefore unclear if and how these reviews notified Dorel of the defect as Plaintiffs allege, and the Court cannot draw a reasonable inference from the allegation and screenshot that these reviews put Dorel on notice of the headrest defect.

2026) [hereinafter Safety 1st Recall Website], cited in Doc. No. 13 ¶ 6 n.5.  The recall affected approximately 180,000 car seats.  Doc. No. 13 ¶ 5.  Dorel offered to send a free replacement headrest pad to purchasers of recalled car seats who registered online; the replacement headrests were available to ship beginning July 2025 (approximately three months after the recall was announced).  Id. ¶¶ 36, 43, 45; see also Safety 1st Recall Website, supra.  Dorel told consumers not to return their car seats to stores, and it did not provide any monetary compensation or refund.  Doc. No. 13 ¶¶ 47–48; see also Safety 1st Recall Website, supra ("Please do not return your car seat to the retailer." (emphasis in original)).

When the car seats were sold, their packaging and other labels did not disclose that the car seats featured a choking hazard (nor did they expressly disclaim a choking hazard).  See Doc. No. 13 ¶¶ 53–54, 69.  Information about accessible choking hazards, such as the headrest foam here, is material to consumers; parents and caregivers make purchasing decisions based on safety information like this.  Id. ¶¶ 53, 64.  According to the amended complaint, customers would not have purchased the car seats, or would have insisted on paying less for them, had they known the car seats could pose a choking hazard during their intended use.  Id. ¶¶ 58–59, 62, 70, 74.

The named plaintiffs are Crystal Shore, Joanna Stewart, and Melissa Kimmel.  Id. ¶¶ 22–24.  All three purchased for their children Safety 1st Grow and Go car seats that were later subject to Dorel's recall.  Id. ¶¶ 75–77, 83–85, 91–93.  Shore lives in California, and she purchased the car seat from Walmart's website in or around September 2023 for roughly $129.  Id. ¶ 75.  Stewart lives in Maryland, and she purchased the car seat from Walmart "around 2023" for approximately $140.  Id. ¶ 83.  Kimmel lives in Illinois, and she purchased the car seat from Walmart "around 2024" for approximately $100.  Id. ¶ 91.  Plaintiffs do not allege any of their children accessed the foam under the headrest cover.

4

When purchasing the car seats, Plaintiffs "read and reviewed the accompanying labels and disclosures and understood them as representations by [Dorel] that the [car seat] was adequately manufactured, labeled, free from defects, and that the misrepresentations concerning safety of the [car seat] were true." Id. ¶¶ 79, 86, 95.

No plaintiff would have purchased the car seat had they known of the safety risks it posed. Id. ¶¶ 80, 87, 96. They each paid a price premium based on Dorel's representations of safety. Id. ¶¶ 82, 90, 98. Stewart stopped using the car seat out of fear for her child's safety.[4] Id. ¶ 88. Shore and Kimmel believed, "at the point of purchase," that the car seat "was safe to use as intended based on [Dorel's] safety misrepresentations." Id. ¶¶ 78, 94.

Plaintiffs bring suit under the Class Action Fairness Act and Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3). They seek to represent a "nationwide class" defined as: "All persons who purchased [the Safety 1st Grow and Go Sprint Car Seat] in the United States for personal or household use during the fullest period provided by law." Doc. No. 13 ¶ 104. They likewise seek to certify California, Maryland, and Illinois subclasses for persons who purchased the car seat in those states. Id. ¶ 105. The classes are defined to exclude, among others, purchasers who "allege personal bodily injury resulting from use" of the car seat. Id. ¶ 106.

Plaintiffs assert eight claims: breach of express warranty (Count I); breach of the implied warranty of merchantability (Count II); violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5), (a)(7), Unfair Competition Law ("UCL"), Cal. Bus. &

---

[4] The amended complaint does not specify when Stewart stopped using the car seat or for how long. The Court draws the following reasonable inferences in her favor. First, that Stewart stopped using the car seat once she learned about the headrest defect, given that she alleges she stopped using it "[f]earing for her child's safety," Doc. No. 13 ¶ 88, and that this occurred shortly after the recall notice issued. Second, that Stewart procured a replacement, or otherwise altered her behavior (e.g., by not driving) while she was not using the Safety 1st car seat, given that (as defense counsel has argued) car seats are required for young children to ride in a vehicle.

Prof. Code § 17200, and False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 (Counts III–V); violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA"), 815 Ill. Comp. Stat. § 505 (Count VI); unjust enrichment (Count VII); and fraudulent concealment (Count VIII).[5]  They seek damages (compensatory, statutory, and punitive), restitution, disgorgement, and costs and fees.

Plaintiff Shore filed suit on May 5, 2025.  Doc. No. 1.  After Dorel moved to dismiss, Doc. No. 6, Shore amended her complaint and added Stewart and Kimmel as named plaintiffs, Doc. No. 13.  On September 17, 2025, Dorel moved to dismiss the first amended complaint under Rules 12(b)(1) and 12(b)(6) or, alternatively, to strike the class allegations under Rule 12(f).  Doc. No. 27.  The Court struck Plaintiffs' original opposition brief as a sanction for their attorneys' inclusion of multiple AI-based fabrications and failure to timely fix those errors.  Doc. No. 35.  Per the Court's order, Plaintiffs filed a revised opposition brief, Doc. No. 37, to which Dorel replied, Doc. No. 41.  The Court held oral argument on July 8, 2026, Doc. No. 44, and now resolves the motion to dismiss.[6]

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This standard requires more than "labels and conclusions" or "naked assertions devoid of further factual enhancement."  Id. (citation modified).  In considering a motion to dismiss, a court accepts all well-pleaded facts as

---

[5] Although the amended complaint does not specify which state's law governs the warranty and fraudulent-concealment claims, the parties agreed at oral argument (and in their briefing) that Massachusetts law governs.

[6] Plaintiffs have indicated, both in their papers and at oral argument, they will request leave to amend their complaint a second time if the Court grants the pending motion to dismiss.  Doc. No. 37 at 8 n.1.

true and draws all reasonable inferences in the plaintiff's favor.  Watterton v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  However, a court disregards factual allegations in the complaint that have been "conclusively contradicted" by other materials properly considered on a motion to dismiss. Lister v. Bank of Am., N.A., 790 F.3d 20, 23 (1st Cir. 2015).

As the party invoking federal jurisdiction, Plaintiffs bear the burden of showing they have Article III standing.  TransUnion LLC v. Ramirez, 594 U.S. 413, 430 (2021).  "A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"  Id. at 431 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); see also Webb v. Injured Workers Pharmacy, LLC, 72 F.4th 365, 371 (1st Cir. 2023) (noting typical plausibility standard applies when evaluating standing at motion-to-dismiss stage).

 III.    DISCUSSION

 "When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court . . . should ordinarily decide the 12(b)(1) motion first."  Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir. 1995).  The Court addresses the jurisdictional issues first, before evaluating the sufficiency of each claim in turn; it then resolves Dorel's request to strike the class allegations.

A.    Standing

Federal courts are courts of limited jurisdiction.  See Food & Drug Admin. v. All. for Hippocratic Med., 602 U.S. 367, 378–82 (2024).  A federal court's power is limited to actual "Cases" and "Controversies" within its jurisdiction.  U.S. Const. art. III, § 2; see also, e.g., Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (citation modified)).

"A proper case or controversy exists only when at least one plaintiff establishes that she has standing to sue." Murthy v. Missouri, 603 U.S. 43, 57 (2024) (citation modified). The party invoking federal jurisdiction (here, Plaintiffs) bears the burden to establish the "irreducible constitutional minimum" of Article III standing—that she (1) has suffered a cognizable injury in fact that is both (2) traceable to the challenged conduct of the defendant and (3) likely to be redressed by a favorable judicial decision. See Spokeo, 578 U.S. at 338. When conducting the "context-specific" inquiry to determine whether a plaintiff has plausibly alleged the elements of standing, a court must read the complaint "as a whole," accept the factual allegations as true and "indulge all reasonable inferences" in the plaintiff's favor, and draw on the court's "judicial experience and common sense." In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig., 54 F.4th 28, 34, 39 (1st Cir. 2022) (citation modified). Whether a plaintiff has standing is a distinct inquiry from whether the plaintiff's claims have merit. Id. at 34–35.

"An 'injury in fact' is an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. at 34 (citation modified). "It is a bedrock proposition that a relatively small economic loss—even an identifiable trifle—is enough to confer standing." Katz v. Pershing, 672 F.3d 64, 76 (1st Cir. 2012) (citation modified).

The First Circuit has "repeatedly recognized overpayment as a cognizable form of Article III injury." In re Evenflo, 54 F.4th at 35 (citing Gustavsen v. Alcon Lab'ys, Inc., 903 F.3d 1, 7–9 (1st Cir. 2018); In re Asacol Antitrust Litig., 907 F.3d 42, 47 (1st Cir. 2018); In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 160 (1st Cir. 2009)). It has explained that, when plaintiffs "argue that they overpaid (or purchased the product at all) because of [the manufacturer's] past misrepresentations," the plaintiffs may have alleged a cognizable

8

"overpayment" injury.  Id. at 36.  It cited favorably to a Seventh Circuit decision holding that "a group of parents who had bought, but whose children had not been injured by, a defective toy had standing to sue based on a 'financial [injury]: they paid more for the toys than they would have, had they known of the risks the [toys] posed to children.'"  Id. at 37 (alteration in original) (quoting In re Aqua Dots Prods. Liab. Litig., 654 F.3d 748, 751 (7th Cir. 2011)).  Put somewhat differently, plaintiffs experience a cognizable economic injury when they are "deprived of the benefit of their bargain," even if only through a "diminution—rather than a complete loss—in value."  Id. at 36–38 (citing Cole v. Gen. Motors Corp., 484 F.3d 717 (5th Cir. 2007); Debernardis v. IQ Formulations, LLC, 942 F.3d 1076 (11th Cir. 2019)).

Dorel argues Plaintiffs lack Article III standing because they allege "abstract economic loss" without "any assertion of physical injury, product malfunction, or denial of the recall remedy."  Doc. No. 28 at 9, 12–14 (citing Kerin v. Titeflex Corp., 770 F.3d 978, 985 (1st Cir. 2014); In re Fruit Juice Prods. Mktg. & Sales Pracs. Litig., 831 F. Supp. 2d 507, 510–13 (D. Mass. 2011)).  This argument mirrors a contention the First Circuit already rejected: that "where a plaintiff is not actually injured by an allegedly unsafe product, she does not have standing to pursue a claim for damages."  In re Evenflo, 54 F.4th at 35.  It fails under that binding precedent.

Dorel elsewhere frames Plaintiffs' injury as a "risk of future harm" and argues that, because only thirteen cases of children putting foam in their mouth resulted from 180,000 affected car seats, Plaintiffs have not shown an adequate risk to support standing.  Doc. No. 28 at 12–14 (citing Kerin, 770 F.3d at 985); Doc. No. 41 at 9–10 (same).  But Dorel's attempts to shoehorn Plaintiffs' theory into the "risk of future harm" framework fails.  Plaintiffs do not argue they have standing because the car seats had the potential to injure their children.  They allege that they lost the benefit of their bargain—that their purchase decision and willingness to pay

9

relied on Dorel's misrepresentations that the car seat was designed to be, and was, safe for its expected use.  See In re Evenflo, 54 F.4th at 36 (distinguishing Kerin along similar lines). Exactly how much they overpaid, or what formula they would use to quantify that injury, does not bear on whether they have sufficiently alleged standing.  Id. at 40.

Of course, it is one thing to have a theory; it is another to plausibly allege a plaintiff has suffered that injury.  But here, Plaintiffs have done enough, at least at the pleadings stage.

Plaintiffs plausibly contend that they did not get the benefit of their bargain: a car seat in which their children could safely ride.  The safety promised by a car seat is not only that it will protect the child in the event of a crash, but also that the child will stay safe while riding—that is, while the child is in the back seat, somewhat out of sight and reach of the car's driver.  Dorel advertised its Safety 1st car seats as "designed to provide protection" and to ensure the "road ahead is comfortable and secure," giving the parent "comfort in knowing [their] child is riding safe."  Doc. No. 13 ¶ 38.  It invoked the dual purposes car seats promise to serve.  Yet Dorel did not disclose that certain of its Safety 1st car seats had a design defect that presented a choking hazard—a disclosure one would expect to be made explicit on a children's product, and the omission of which suggests the product did not pose a choking hazard.  Id. ¶¶ 53–54, 69. Plaintiffs allege that they read and relied on the labels and disclosures, and that they were misled (both by the "safety" claims and the omission of any choking-hazard disclosures) about the safety of the products they purchased.  Id. ¶¶ 79, 86, 95.  Their purchase decisions and willingness to pay relied, they allege, on Dorel's misrepresentations.

This point is made most clearly during the three-month period between when Dorel announced its recall and before its replacement headrests were available.  Stewart alleges that she stopped using her car seat out of fear for her children's safety.  Id. ¶ 88.  Stewart must have

somehow procured another car seat or otherwise altered her behavior by, for example, not driving with her child in the car. (As noted above, and as defense counsel has argued, car seats are mandatory for small children.) The alternative—using the car seat despite its known defect—would have required at least increased vigilance, a burden Plaintiffs expected to mitigate or avoid as part of the benefit of their bargain. This response illustrates that Plaintiffs relied on Dorel's representations that its Safety 1st car seat was "designed" for safety. It also supports Plaintiffs' allegations that they would not have purchased the car seat at all, or would have done so only at a lower price, had they known the claims of "safety" that form the centerpiece of Dorel's Safety 1st marketing were misrepresentations. This was not the safe product they thought they had purchased.

These allegations bring this case within the ambit of the "overpayment" injury recognized in cases like In re Evenflo. See 54 F.4th 28. In that case, the plaintiffs alleged that a booster seat's manufacturer had misrepresented the product's safety—by marketing it as safe for use for children weighing at least thirty pounds, when public guidance recommended that booster seats not be used for children under forty pounds, and by representing it as "side impact tested" aligned with government standards when its testing deviated from government norms. Id. at 32–33. They did not allege that their children had been physically injured by the unsafe booster seats, but that they had overpaid for the seats—that they would have insisted on paying less, or would not have bought the booster seat at all, had they known of the manufacturer's misrepresentations. Id. at 33–34. The Circuit held the plaintiffs had sufficiently alleged an injury-in-fact for Article III standing, reasoning that the complaint—when "read as a whole" and considering "judicial experience and common sense"—plausibly alleged that, "as a result of [the

11

manufacturer's] misrepresentations, the plaintiffs spent more money than they otherwise would have." Id. at 39 (citations modified).

So too here.  Plaintiffs allege that Dorel's "Safety 1st" branding and representations of the car seat's "design" for children's "comfort and safety" misrepresented specific qualities of the car seat.  They allege that, had they known of Dorel's misrepresentations, they would have insisted on paying less for the car seat, or would not have purchased it at all.  One plaintiff alleges that, upon learning of the defect, she did stop using the car seat out of fear for her children's safety.  Plaintiffs' allegations (accepted as true at this stage), when considered as a whole and in light of judicial experience and common sense, are plausible.  As alleged, the car seat had a design defect that posed a choking hazard when used as intended, that is, with a child sitting in it, in the back seat of a car, not directly supervised by an adult.  Had Dorel disclosed that the car seat was unsafe to use while driving (i.e., as intended) because it posed a choking hazard, Plaintiffs plausibly would have chosen to purchase a different car seat or would have, at least, been only willing to pay less for this car seat.

Dorel attempts to distinguish In re Evenflo by arguing that, in that case, the plaintiffs alleged they relied on the manufacturer's "misrepresentations," while here, Plaintiffs allege an "omission theory based on Dorel's supposed failure to disclose [the defect] to them."  Doc. No. 41 at 10.  But Plaintiffs here do allege misrepresentations—that the product was safely designed for its typical use when it was not, and that (impliedly) it did not pose a choking hazard when it did—although they are less specific than the misrepresentations at issue in In re Evenflo.  Whether these alleged misrepresentations are actionable is a merits question whose resolution does not bear on standing.  See In re Evenflo, 54 F.4th at 34–35, 41.

If this case progresses, of course, Plaintiffs will have to prove their case, including that they have standing. For now, they have plausibly pleaded a cognizable injury in fact.

Dorel makes no challenge to the other elements of Article III standing (traceability and redressability), and the Court detects none. Plaintiffs have plausibly alleged Article III standing to seek monetary relief based on their overpayment injury, and the Rule 12(b)(1) motion to dismiss is DENIED. The Court turns next to the Rule 12(b)(6) motion.

B.    Breach of Express Warranty (Count I)

Plaintiffs first assert a claim for breach of an express warranty. Doc. No. 13 ¶¶ 124–133. This claim fails because the warranty was limited to one year after the date of purchase, the one-year limit is enforceable, and Plaintiffs bring their claims beyond that one-year limit.

Massachusetts has adopted the Uniform Commercial Code ("UCC"). See Cambridge Plating Co., Inc. v. Napco, Inc., 991 F.3d 21, 25 (1st Cir. 1993). Claims for breach of a contract for the sale of goods are governed by the "detailed provisions of the UCC" rather than "judicially crafted accrual rules," including the discovery rule. Id.; see also, e.g., Costa v. FCA US LLC, 542 F. Supp. 3d 83, 104 (D. Mass. 2021) (noting "[t]he discovery rule . . . does not supersede the UCC"). Under the UCC, a cause of action for breach of warranty "accrues when the breach occurs"—that is, "when tender of delivery is made"—"regardless of the aggrieved party's lack of knowledge of the breach." Mass. Gen. Laws ch. 106, § 2-725(2). A statutory discovery rule applies only when "a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance," in which case "the cause of action accrues when the breach is or should have been discovered." Id. The statute of limitations for a breach of contract claim is four years, but parties "may reduce" that period to as little as one year "[b]y the original agreement." Id. § 2-725(1).

13

The car seat came with an express, written warranty.  Doc. No. 28-1 (warranting "original retail purchaser" of car seat "against defective materials or workmanship for one year from the date of original purchase").  Plaintiffs do not allege that Dorel breached the terms of that written warranty.  Instead, they argue that Dorel's "Safety 1st" branding created a warranty "that the product has been designed and tested to meet rigorous safety standards."  Doc. No. 37.  They further argue that statements in the car seat's marketing and labeling made "specific assurances of product performance in protecting infants," specifically: (1) "Safety 1st has a wide range of baby car seats and safety products to keep your baby safe"; (2) "The road ahead is comfortable and secure when your little one rides in a Safety 1st car seat"; and (3) "[Car seats are] designed to provide protection for your little one, so you can take comfort in knowing that your child is riding safe."  Doc. No. 37 at 12–13 (citing Doc. No. 13 ¶¶ 18–20, 37–39).

Even assuming (without deciding) these statements were the kind of representations that could create a warranty rather than mere puffery or sales talk, and assuming (without deciding) Plaintiffs relied on these statements in purchasing their car seats, their claim fails because it was not made within one year of their purchase of the car seat, as required by the plain terms of the written warranty.  Doc. No. 28-1.

Plaintiffs do not dispute that their claims fall outside the one-year warranty period.[7]  Instead, they argue that the discovery rule should toll the warranty period's clock, Doc. No. 37 at

---

[7] Plaintiffs do not argue that any of them filed suit within one year of purchasing their car seat.  Doc. No. 37 at 12–15.  Although it is conceivable, based only on the amended complaint, that Kimmel (who bought her car seat "around 2024") might have been within the one-year period when she joined this suit on August 18, 2025, Doc. No. 13 ¶ 91, such a vague allegation does not cross the line from possible to plausible.  (No party advances any argument that Kimmel's claim should relate back to the filing of the original complaint, nor that her claim would be timely if it did relate back.)  In any event, the Court considers Plaintiffs' lack of any contrary argument as a concession that Kimmel's purchase fell outside the one-year window.

15 (citing <u>Bowen v. Eli Lilly & Co.</u>, 557 N.E.2d 739, 740–41 (Mass. 1990)), or that the one-year warranty period was unconscionable, <u>id.</u> at 14–15 (citing <u>Duncan v. Nissan N. Am., Inc.</u>, 305 F. Supp. 3d 311, 317–20 (D. Mass. 2018)).  These arguments fall short.

First, under Massachusetts law, the UCC—not the judicially created discovery rule—governs the timeliness of claims for breach of a contract for the sale of goods.  Mass. Gen. Laws ch. 106, § 2-725(2); <u>Cambridge Plating Co.</u>, 991 F.3d at 25.  A breach-of-warranty claim accrues, in most circumstances, when "tender of delivery is made."  Mass. Gen. Laws ch. 106, § 2-725(2).  Under this accrual rule, Plaintiffs' express-warranty claims are time-barred.

Massachusetts law does provide for a statutory discovery rule when a "warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance."  <u>Id.</u>  But Plaintiffs do not argue that the statutory discovery rule applies here.  And, in any event, none of the statements Plaintiffs identify as express warranties "explicitly extends to future performance of" the car seat.  <u>Id.</u>; <u>see also</u> <u>Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.</u>, 524 F.3d 315, 323–25 (1st Cir. 2008) (noting courts applying this provision "look to the language of the warranty itself to determine whether it <u>explicitly</u> guarantees the future performance of the goods" (emphasis in original)).

Second, the contractual one-year warranty period is not unconscionable.  In Massachusetts, "unconscionability must be determined on a case by case basis . . . giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party."  <u>Zapatha v. Dairy Mart, Inc.</u>, 408 N.E.2d 1370, 1376 (Mass. 1980); <u>see also</u> <u>Duncan</u>, 305 F. Supp. 3d at 317–20.  The UCC commentary provides that "the basic test is whether in the light of the general commercial background and the commercial needs of the particular trade or case,

the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract," and that the "principle is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power."  Mass. Gen. Laws ch. 106, § 2-302, at cmt. 1.

Plaintiffs argue that the one-year warranty limitation is both procedurally and substantively unconscionable.  Doc. No. 37 at 14; see also Doc. No. 13 ¶ 132 (alleging, under Count II, that "Plaintiffs did not receive or otherwise have the opportunity to review, at or before the time of sale, any purported warranty exclusions and limitations").  But their amended complaint does not plausibly support their claim of unconscionability.  Although Plaintiffs contend they received the written warranty after purchase and had no meaningful choice regarding its terms, Doc. No. 37 at 14, they do not allege or argue that the written warranty was provided beyond the period by which they could have returned the car seat to the retailer.  Nor does the amended complaint allege that Plaintiffs (or parents generally) have "limited options" when making car seat purchases, as asserted in Plaintiffs' brief.  Id.  Similarly, the amended complaint does not allege—much less plausibly allege—that, as Plaintiffs now argue, Dorel "timed the [warranty] limitation to exclude the defect."  Id.  Nothing about the alleged defect in this case is particularly time- or use-dependent.  Cf. Duncan, 305 F. Supp. 3d at 320 (distinguishing between parts of a car that "must be routinely replaced" and those that "are expected to last the lifetime of the car" and finding warranty limit unconscionable as to defective car part in latter category).  Indeed, the NHTSA report shows at least four instances of parents

16

discovering the defect within months of purchase.[8]  Plaintiffs have not shown that the one-year limitation on express warranties is unconscionable.

Under the terms of the parties' agreement and the allegations in the amended complaint, Plaintiffs' claim for breach of express warranty is untimely.  The motion to dismiss is therefore ALLOWED as to Count I.

### C.    Breach of Implied Warranty of Merchantability (Count II)

Plaintiffs also allege that Dorel breached the implied warranty of merchantability.  Doc. No. 13 ¶¶ 124–133.  Dorel's written warranty for this Safety 1st car seat stated that "[a]ny implied warranties, including implied warranties of the merchantability and fitness for a particular purpose, shall be limited to the duration and terms of the express written warranty." Doc. No. 28-3.  Relying on this contractual limitation, Dorel contends that the same untimeliness analysis for Count I applies to Count II.  Doc. No. 37 at 16–17.  Untimeliness is the sole argument Dorel makes for dismissal of Count II.  Id.; Doc. No. 41 at 14–16.  But this argument fails because it misapprehends Massachusetts law.

The warranty of merchantability is "implied in a contract for [the sale of goods] if the seller is a merchant with respect to goods of that kind."  Mass. Gen. Laws ch. 106, § 2-314(1). "Merchantability" means, among other things, that the goods are "fit for the ordinary purpose for which such goods are used."  Id. § 2-314(2)(c).  The statute of limitations for breach-of-warranty actions is four years, though parties can, by contract, reduce the period of limitation to one year. Mass. Gen. Laws ch. 106, § 2-725(1).  A seller may "exclude or modify" the implied warranty of merchantability through language specifically mentioning "merchantability."  Id. § 2-316(2).

---

[8] The affected products were manufactured between February and December 2023, and the NHTSA report states that Dorel received one foam-in-mouth complaint in June 2023 and three in October 2023.  Doc. No. 28-3 at 3; Doc. No. 13 ¶¶ 5, 43.  The Court draws the reasonable inference that all four instances occurred within one year of manufacture and purchase.

When it comes to consumer goods and services, however, Massachusetts law precludes sellers and manufacturers from excluding or modifying the implied warranty of merchantability. Jacobs v. Yamaha Motor Corp., U.S.A., 649 N.E.2d 758, 761 (Mass. 1995).  Massachusetts has given the "contract-based warranty claims of buyers of consumer goods . . . special legislative treatment."  Id. at 763.  The statute provides, "Any language, oral or written, used by a seller or manufacturer of consumer goods and services, which attempts to exclude or modify any implied warranties of merchantability and fitness for a particular purpose or to exclude or modify the consumer's remedies for breach of those warranties, shall be unenforceable."  Mass. Gen. Laws ch. 106, § 2-316A(2); see also id. § 2-316A(5) (providing that "[t]he provisions of this section may not be disclaimed or waived by agreement").  "Consumer goods" are defined as "goods that are used or bought for use primarily for personal, family, or household purposes."  Mass. Gen. Laws ch. 106, § 9-102(23); see also id. § 2-103(3) (incorporating definition from § 9-102).

No party presently disputes that the car seats at issue in this case are "consumer goods," nor that the implied warranty of merchantability covers these car seats.  The only issue is whether Dorel's written disclaimer, purporting to "limit" the implied warranty of merchantability "to the duration and terms of the express written warranty," is enforceable.  Doc. No. 28-3.

Under the statute's plain language, the answer is no.  The statutory text is clear: "[a]ny language . . . attempt[ing] to exclude or modify" an implied warranty of merchantability or the "consumer's remedies for breach . . . shall be unenforceable."  Mass. Gen. Laws ch. 106, § 2-316A(2) (emphasis added).  Parties may not "disclaim[] or waive[]" this statutory provision by contract.  Id. § 2-316A(5).  This clear language reflects Massachusetts's consumer-protective public policy.  See Jacobs, 649 N.E.2d at 763.  Dorel's attempt to "modify" the implied warranty of merchantability and consumers' remedies for breach of that warranty—by reducing its

18

limitation period from four years to one—is "unenforceable."  Mass. Gen. Laws ch. 106, § 2-316A(2), (5); see also Holzman v. Gen. Motors Corp., No. 021368, 2007 WL 4098913, at *11 (Mass. Super. Ct. Nov. 6, 2007) (concluding common issues did not predominate in putative class comprising commercial and consumer purchasers because commercial purchasers would be "limited, by the terms of the warranty manual, to the period of the express warranty, a limitation that would not apply to consumer purchasers" (citing Mass. Gen. Laws ch. 106, § 2-316A)).

Dorel asserts that the limitations in its written warranty "are valid and enforceable in Massachusetts."  Doc. No. 28 at 16–17 (citing Mass. Gen. Laws ch. 106, § 2-316(3)).  But it does not mention, or advance any argument relating to, the special statutory provision for consumer goods in § 2-316A.  Indeed, the sole case it cites involves a software-as-a-service contract between two corporations—not a contract for the sale of consumer goods.  See Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101, 108 (D. Mass. 2021).

Dorel advances no other arguments for dismissal of Count II.  Doc. No. 28 at 16–17; Doc. No. 41 at 14–16.  It therefore waives any further argument that Plaintiffs have failed to state a claim on Count II.

Because Dorel has not shown that Plaintiffs' claims for breach of the implied warranty of merchantability are time-barred, the motion to dismiss is DENIED as to Count II.

D.    California Consumer-Protection Statutes (Counts III, IV, and V)

Plaintiff Shore asserts claims under three California consumer-protection statutes: the CLRA, UCL, and FAL.  Doc. No. 13 ¶¶ 133–161.  All three fail because Shore does not plausibly allege that Dorel knew about the car seat defect before she purchased her car seat.

The CLRA prohibits "unfair methods of competition" and "unfair or deceptive acts or practices" involved in the "sale or lease of goods or services to any consumer."  Cal. Civ. Code § 1770(a).  "Sellers can be liable under [the] CLRA for making affirmative misrepresentations as

19

well as for failing to disclose defects in a product." Baba v. Hewlett-Packard Co., No. 09-cv-05946-RS, 2010 WL 2486353, at *3 (N.D. Cal. June 16, 2010).  The UCL prohibits business acts or practices that are (1) unlawful, (2) fraudulent, or (3) unfair.  Cal. Bus. & Prof. Code § 17200.  The FAL prohibits both "untrue" and "misleading" advertising—that is, "not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." Kasky v. Nike, Inc., 45 P.3d 243, 250 (Cal. 2002) (citation modified); Cal. Bus. & Prof. Code § 17500.

As both parties agree, Doc. No. 28 at 17; Doc. No. 37 at 16, and as they confirmed at oral argument, to sustain an action under California's consumer-protection statutes, a plaintiff must "sufficiently allege that a defendant was aware of a defect at the time of sale." Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1145–46 (9th Cir. 2012).  Conclusory allegations that a defendant was "on notice" of a defect, or that a defendant-manufacturer has "superior" or "exclusive" knowledge about a product, without more, are inadequate. Id. at 1146–47.  Under some circumstances, consumer complaints can support an inference of a defendant's knowledge—but "undated customer complaints" fail because they "provide no indication whether the manufacturer was aware of the defect at the time of sale." Id. at 1147 (emphasis in original).  Only one or a handful of consumer complaints, without more, do not establish knowledge. See Williams v. Yamaha Motor Co. Ltd., 851 F.3d 1015, 1027–28 (9th Cir. 2017) (noting that when plaintiff identified only fourteen customer complaints, did not identify where or how complaints were made, and did not provide dates for twelve of the fourteen complaints, "it would be speculative at best to find the defendant knew of the alleged defect" (citing Wilson, 558 F.3d at 1147–48)); see also Baba v. Hewlett-Packard Co., No. 09-cv-05946-RS, 2011 WL 317650, at *3 (N.D. Cal. Jan. 28, 2011) ("Awareness of a few customer complaints . . . does not

20

establish knowledge of an alleged defect."); Sloan v. Gen. Motors LLC, No. 16-cv-07244-EMC, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017) ("[C]onsumer complaints suffice to establish knowledge only where there were an <u>unusual</u> number of complaints, such that the manufacturer would be on notice of a specific problem." (emphasis in original)).

Shore alleges she purchased her car seat in or around September 2023. <u>Id.</u> ¶ 75. To make out her claims under the California consumer-protection statutes, then, Shore would need to adequately plead that Dorel was aware of the headrest defect by September 2023. Nowhere in the amended complaint do Plaintiffs allege when Dorel learned of the defect. <u>See generally</u> Doc. No. 13. Instead, Shore points to four categories of allegations in the amended complaint she says demonstrate Dorel's presale knowledge. Doc. No. 37 at 16–18. Whether considered individually or together, these allegations do not show presale knowledge.

First, Shore says knowledge can be inferred from required industry-standard testing, citing the allegation that "before making the [car seat] available for sale, [Dorel], through industry-standard product testing, was aware, or undoubtedly should have been aware, that the [c]ar [s]eats' headrest cover can become unsecured." Doc. No. 37 at 16 (quoting Doc. No. 13 ¶ 10). This is the only allegation in the amended complaint relating to Dorel's car-seat testing. The amended complaint does not describe with any specificity the nature of the "industry-standard testing" that put Dorel on notice of the headrest issue. A conclusory allegation that Dorel knew or should have known about the defect thanks to "industry-standard product testing" is no different from the conclusory allegation that, thanks to its position as the manufacturer, a defendant had superior knowledge of a product's defects. <u>See Wilson</u>, 668 F.3d at 1147 (citing <u>Tietsworth v. Sears, Roebuck & Co.</u>, No. 5:09-cv-00288-JF, 2009 WL 3320486, at *4 (N.D. Cal. Oct. 13, 2009); <u>Oestreicher v. Alienware Corp.</u>, 544 F. Supp. 2d 964, 974 (N.D. Cal. 2008)).

21

That is not to say that allegations about a manufacturer's testing are never adequate to establish presale knowledge.  See, e.g., id. at 1146 (noting that when plaintiff specifically alleged manufacturer "adheres to 'recognized ISO/IEC 24734 and 24735 standards,' which require multiple tests using repeated scanning of a multi-page document" along with "customer complaints concerning the defect three months before the plaintiff purchased his printer," plaintiff had adequately pled presale knowledge (citing Kowalsky v. Hewlett-Packard Co., No. 10-cv-02176-LHK, 2011 WL 3501715 (N.D. Cal. Aug. 10, 2011))).  But a single conclusory allegation about "industry-standard" testing—without any details regarding what that testing involves, what conditions it reveals, or how it would show the headrest defect—is not enough.

Second, Shore says that the consumer complaints Dorel received, prompting the recall, support an inference of presale knowledge.  Doc. No. 37 at 16–17.  Plaintiffs allege that Dorel received at least thirteen consumer complaints before it issued its voluntary recall on April 18, 2025, for car seats produced between February and December 2023.  Doc. No. 13 ¶ 42.  They also allege generally that Dorel knew of the defect from online reviews, but they fail to elaborate about the substance or timing of these reviews.  Id. ¶ 33.  Shore argues that, given the "time lag between when consumers experience problems, contact manufacturers, and manufacturers investigate and announce recalls, it is plausible that [Dorel] received at least some of the [thirteen] complaints months before the April 2025 recall announcement—and therefore before or shortly after Shore's September 2023 purchase."⁹  Doc. No. 37 at 17.

Even drawing all reasonable inferences in Shore's favor, however, she has not provided any nonspeculative basis, from the consumer complaints, that Dorel knew of the defect by

---

⁹ Of course, when consumers experience the defect does not establish when Dorel knew of the problem, and an inference that Dorel "received at least some" complaints "shortly after" Shore's purchase would not help Shore at all.

September 2023.  Based only on the allegations in the amended complaint, it would not be reasonable to infer that Dorel had received most or all of the thirteen consumer complaints before Shore's September 2023 purchase.  The defect affected nearly 180,000 car seats manufactured from February to December 2023 (i.e., including at least three months after Shore's purchase), and Dorel with NHTSA did not recall the car seats until April 2025, at which point they pointed to just the thirteen case reports.  Fewer than thirteen presale consumer complaints and unspecified online ratings, without more, do not suffice to establish Dorel's presale knowledge.  See Wilson, 668 F.3d at 1147–48.  They do not provide a nonspeculative basis to conclude that Dorel was aware of the headrest issue by September 2023.  Id.; see also Williams, 851 F.3d at 1027–28.

The public NHTSA report (on which Plaintiffs relied at oral argument) only confirms this conclusion.  It states that Dorel received one consumer report in June 2023 and three more in October 2023.  Doc. No. 28-3 at 3.  In other words, Dorel had received a single customer report before Shore purchased her car seat in September 2023.  Without more (and there is no more here), a single customer report of a child accessing foam did not render Dorel aware that its car seat was defectively designed, much less of the specific defect that later prompted the recall.

Third, Shore argues that presale notice "can be inferred from the nature of the defect itself, particularly where the hazard is foreseeable," and contend that Dorel "cannot claim that it did not foresee a hazard that federal regulations specifically require manufacturers to test for and prevent."  Doc. No. 37 at 17–18 (citing 16 C.F.R. § 1501).  Whatever truth that may have as a general proposition, it is inadequate to show Dorel's presale knowledge here.  Shore offers no authority to support this claim.  Indeed, she cites only a regulation governing children's products, but not car seats.  Compare 16 C.F.R. § 1501.2(a) ("This regulation . . . applies to all toys and

23

other articles intended for use by children under 3 years . . . ."), with 49 C.F.R. § 571.213 ("This standard specifies requirements for child restraint systems used in motor vehicles and aircraft."). This argument is just another way of saying that the "industry-standard" testing made or should have made Dorel aware of the headrest issue, and it fails for the same reasons.

Finally, Shore argues that Dorel's duty to disclose the headrest defect arose from its "active concealment"—that, by advertising its car seat as designed for children's safety, it had a duty to disclose known safety hazards. Doc. No. 37 at 18. This argument begs the question. The issue is whether the safety hazard was known at the time of Shore's purchase. This argument does not provide a basis to conclude Dorel had the necessary presale knowledge.

For all the reasons explained above, Shore has not adequately pleaded that Dorel was aware of the headrest issue by September 2023, when she purchased her car seat. For that reason alone,[10] the motion to dismiss is ALLOWED as to Counts III, IV, and V.

### E.    Illinois Consumer Fraud and Deceptive Business Practices Act (Count VI)

Plaintiff Kimmel brings an ICFA claim, alleging Dorel's (1) misrepresentation of the Safety 1st car seats as "safe" for ordinary use and (2) omission of the choking hazard posed by the headrest defect were unfair and deceptive acts or practices. Doc. No. 13 ¶¶ 162–180. Dorel argues Kimmel's Illinois claim fails for the same reasons Shore's California claims do: a lack of presale knowledge by Dorel. Dorel further argues that Kimmel's ICFA claim must satisfy (but has not satisfied) the heightened pleading requirements of Rule 9(b). Doc. No. 28 at 23; Doc. No. 14 at 23. The Court takes each argument in turn.

"When bringing an ICFA claim based on an omission, it is not enough to allege that [a product has] a defect. . . . [T]he complaint also needs to allege that [Dorel] knew about the defect

---

[10] In light of the Court's resolution of these claims, it need not reach Dorel's other arguments for dismissal. Doc. No. 28 at 18–22.

and omitted or concealed it knowing the truth." Castaneda v. Amazon.com, Inc., 679 F. Supp. 3d 739, 753 (N.D. Ill. 2023) (emphasis in original); see also, e.g., Santiago v. Tesla, Inc., 757 F. Supp. 3d 831, 841–42 (N.D. Ill. 2024).

As noted above, Plaintiffs do not say when Dorel became aware of the headrest defect, alleging only that Dorel received thirteen complaints before the recall as well as some (unspecified and undated) online consumer reviews. According to the public NHTSA report, Dorel received at least four consumer reports about the headrest foam in 2023, and thereafter "continued to monitor this issue and include foam in the mouth cases in quarterly EWR reports." Doc. No. 28-3 at 3. On December 30, 2024, ODI "contacted Dorel requesting additional information." Id. ODI and Dorel met several times to review the car seat's headrest design and discuss concerns before announcing the voluntary recall in April 2025. Id.

Kimmel says she purchased her car seat "around 2024." Doc. No. 13 ¶ 91. This allegation fails to cross the line into plausibility. See supra note 7. It strains credulity to suppose that, after conducting a reasonable investigation, a plaintiff could not identify with any more specificity when she purchased a car seat for her young child. And Plaintiffs' implicit concession that their express warranty claims are barred by the one-year limitation period means that Kimmel's purchase took place, at the latest, in August 2024. See supra note 7.

Assuming for present purposes that Kimmel purchased her car seat in or around August 2024, Kimmel has not advanced sufficient factual allegations that could establish Dorel's knowledge prior to her purchase. The factual allegations in the amended complaint, coupled with the public NHTSA report, show that Dorel received four consumer complaints by October 2023 and then received nine more sometime before April 2025. As the Court explained above, a handful of consumer complaints from more than 180,000 units is not, on its own, enough to

25

establish knowledge.  See Castaneda, 679 F. Supp. 3d at 754–55.  The NHTSA report states that Dorel was contacted by ODI for "additional information" about the consumer reports on December 30, 2024.  Even if this outreach were sufficient to establish Dorel's knowledge (an issue the Court does not decide), Kimmel does not plausibly allege that the December 30 outreach pre-dated her purchase.  Cf. Santiago, 757 F. Supp. 3d at 842–43 & n.2 (concluding that one pre-purchase consumer complaint posted on NHTSA website plus, "more importantly," a whistleblower article describing manufacturer's longstanding knowledge of defect sufficed to plausibly allege presale knowledge).  Because Kimmel has not plausibly alleged presale knowledge of the defect, the "omission" theory of her ICFA claim must fail.

While ICFA requires presale knowledge for an "omission" theory, it does not impose that requirement for a "misrepresentation" theory.  See Castaneda, 679 F. Supp. 3d at 752 & n.3 (collecting cases and explaining this distinction while noting it is a major deviation from common law); Martin v. Heinold Commodities, Inc., 643 N.E.2d 734, 754 (Ill. 1994) (recognizing that ICFA "does not require actual reliance, an untrue statement regarding a material fact, or knowledge or belief by the party making the statement that the statement was untrue" and distinguishing ICFA claims from common law fraud).  Indeed, "[i]n most cases under the ICFA, . . . the seller's knowledge or ignorance about the falsity of its representations is irrelevant."  Priebe v. Autobarn, Inc., 240 F.3d 584, 589 (7th Cir. 2001).  As discussed above, Plaintiffs allege that Dorel misrepresented that its car seats were designed for safety (and other similar misrepresentations), and Kimmel argues that these misrepresentations are actionable under ICFA.  Doc. No. 13 ¶¶ 170–180; Doc. No. 37 at 23.  Even if Dorel did not know of the defect before Kimmel's purchase, such a lack of presale knowledge is not fatal to Kimmel's "misrepresentation" ICFA theory.

Kimmel's misrepresentation claim nevertheless fails because it fails to satisfy the heightened pleading requirements of Rule 9(b).

"The Illinois Consumer Fraud Act 'protect[s] consumers . . . against fraud, unfair methods of competition, and other unfair and deceptive business practices.'" Vanzant v. Hill's Pet Nutrition, Inc., 934 F.3d 730, 736 (7th Cir. 2019) (alteration in original) (quoting Robinson v. Toyota Motor Credit Corp., 775 N.E.2d 951, 960 (Ill. 2002)).  "The elements of a claim under ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce."  Siegel v. Shell Oil Co., 612 F.3d 932, 934 (7th Cir. 2010).  "A plaintiff may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive."  Id. at 935.

ICFA's "unfair" and "deceptive" prongs are "distinct categories of ICFA violations" that are subject to different pleading standards: a claim of unfair conduct is subject to the ordinary Rule 8 standard, while a claim of deceptive conduct is subject to the heightened requirements of Rule 9(b).  See Fares v. Char-Broil, LLC, No. 24-cv-04878, 2025 WL 1191729, at *4–5 (N.D. Ill. Apr. 24, 2025) ("[T]he plaintiff [alleging deceptive conduct] must describe the who, what, when, where, and how of the fraud." (citation modified)); accord Santiago, 757 F. Supp. 3d at 844–45.  "An unfair practice claim hinges upon a defendant's allegedly 'unfair or unscrupulous' behavior rather than deceptive behavior."  Quitno v. Gen. Motors, LLC, No. 1:18-cv-07598, 2020 WL 777273, at *4 (N.D. Ill. Feb. 18, 2020) (quoting Stavropoulos v. Hewlett-Packard Co., No. 13-cv-05084, 2014 WL 7190809, at *3 (N.D. Ill. Dec. 17, 2014)).

A plaintiff may not avoid the Rule 9(b) requirements simply by labeling a fraud claim as "unfair."  Santiago, 757 F. Supp. 3d at 844–45 (citing Camasta v. Jos. A. Bank Clothiers, Inc.,

27

761 F.3d 732, 737 (7th Cir. 2014)).  The Court instead considers whether a plaintiff's claim, however labeled, sounds in fraud.  Stavropoulos, 2014 WL 7190809, at *2–3.

Here, Kimmel argues Dorel engaged in both unfair and deceptive conduct.  Doc. No. 37 at 22–24.  Specifically, she argues that it was "unfair" for Dorel to sell car seats "containing a dangerous defect that posed a choking hazard to infants while marketing them under the brand name 'Safety 1st.'"  Id. at 23 (emphasis omitted) (citing Doc. No. 13 ¶¶ 1–6, 18–20, 41–44).  She also contends that Dorel made "deceptive" misrepresentations of the car seats' safety in its advertising and labeling.  Id. (citing Doc. No. 13 ¶¶ 18–21, 37–44).

Though Kimmel labels Dorel's conduct unfair, in truth, her claim sounds in fraud.  The amended complaint alleges that Dorel's marketing materials were "false and misleading because the [car seats] contain a material defect, are not safe for use by its user, and do not function safely or reliably," and that Dorel nevertheless "chose to market the [car seats] in this way to impact consumer choices and gain market share in the growing car seat market."  Doc. No. 13 ¶ 173 (asserting "[t]his conduct is unfair under the ICFA").  In other words, Kimmel alleges that Dorel misrepresented the car seats' safety, that Dorel made those misrepresentations in order to drive sales, and that consumers reasonably relied on those misrepresentations in making their purchasing decisions.  Doc. No. 13 ¶¶ 173, 175–179.  Those allegations describe fraud or deceptive conduct, not "immoral, unethical, oppressive, or unscrupulous" behavior.  Robinson, 775 N.E.2d at 961; cf. Soules v. Gen. Motors Corp., 402 N.E.2d 599, 599 (Ill. 1980) ("[T]he elements of a cause of action for fraudulent misrepresentation . . . are: (1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.").

Properly understood as a deceptive-conduct claim, Kimmel's ICFA claim fails to meet the heightened pleading requirements of Rule 9(b).  "Rule 9(b) requires the plaintiffs to 'state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff,' but plaintiffs are not required to 'provide the precise date, time, and location that [they] saw the advertisement or every word that was included on it.'"  Fares, 2025 WL 1191729, at *5 (alterations in original) (quoting Camasta, 761 F.3d at 737).

The amended complaint does not specify which misrepresentations Kimmel relied on when purchasing her car seat.  Kimmel alleges generally that, "[w]hen purchasing the [car seat], [she] read and reviewed the accompanying labels and disclosures and understood them as representations by [Dorel] that the [car seat] was adequately manufactured, labeled, free from defects, and that the misrepresentations concerning safety . . . were true."  Doc. No. 13 ¶ 95.  She further alleges she "read and relied on [Dorel's] misrepresentations . . . when deciding to purchase the [car seat]" and that, had Dorel "not made the false, misleading, and deceptive misrepresentations," she would not have been willing to purchase the car seat.  Id. ¶ 96.  Elsewhere, Plaintiffs cite as misrepresentations (1) the "Safety 1st" brand name, affixed to the car seats and used in marketing materials, and (2) statements on Safety 1st's website advertising the car seats as "designed to provide protection" and to keep their users "safe."  Id. ¶¶ 13, 38.

Kimmel alleges she bought her car seat from Walmart, not from the Safety 1st website, and she makes no allegation that she visited the Safety 1st website when making or preparing to make her purchasing decision.  Id. ¶ 91.  She identifies no other point-of-sale misrepresentations on which she relied—aside from, perhaps, the Safety 1st brand name itself, which appears on the car seats and (presumably) on their labels and packaging.  Kimmel has not plausibly alleged that

29

the "Safety 1st" brand name is anything more than simple "puffery"—that is, "exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined"—which "do[] not suffice to sustain a[n] [ICFA] claim." Schwebe v. AGC Flat Glass N. Am., Inc., No. 12-cv-09873, 2013 WL 2151551, at *4 (N.D. Ill. May 16, 2013) (second quotation quoting Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801, 846 (Ill. 2005)). Without more, Kimmel has not satisfied Rule 9(b), and she has therefore failed to state a claim on her misrepresentation theory.

For all these reasons, Kimmel has failed to state an ICFA claim under any available prong or theory. Accordingly, the motion to dismiss is ALLOWED as to Count VI.

### F.    Unjust Enrichment (Count VII)

Next, Plaintiffs assert a claim of unjust enrichment. Doc. No. 13 ¶¶ 181–190. Under Massachusetts law, "a party with an adequate remedy at law cannot claim unjust enrichment," and litigants may not "override an express contract by arguing unjust enrichment." Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017) (citation modified). Of course, parties may plead in the alternative. Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012) (citing Fed. R. Civ. P. 8(d)). But "[i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." Shaulis, 865 F.3d at 16 (emphasis added). If Plaintiffs do not plausibly allege that they lack an adequate remedy at law, their unjust-enrichment claim should be dismissed. Id.

Plaintiffs plead unjust enrichment "in the alternative to their breach [of] express warranty claim." Doc. No. 13 ¶ 183. Plaintiffs do not specifically allege, under Count VII, that they lack an adequate remedy at law, see id. ¶¶ 181–190, though Shore includes conclusory allegations to that effect under Counts III through V, see id. ¶ 143 ("Legal remedies available to Plaintiff Shore and California Subclass members are inadequate because they are not equally prompt and certain

30

and in other ways efficient as equitable relief."); id. ¶ 152 ("Plaintiff Shore and the California Subclass lack an adequate remedy at law for the same reasons alleged above."); id. ¶ 160 (similar). Plaintiffs' opposition brief does not respond to Dorel's argument that the unjust-enrichment claim should be dismissed because Plaintiffs have an adequate remedy at law. Contrast Doc. No. 28 at 23–24, and Doc. No. 41 at 24, with Doc. No. 37 at 23.

Plaintiffs have not plausibly alleged that they lack an adequate remedy at law. Contract damages are available to Plaintiffs. This is not a case in which the alleged misconduct giving rise to their unjust-enrichment claim is beyond the scope of the parties' contract. Cf. Lass, 695 F.3d at 140 (concluding plaintiff could plead in the alternative where parties' contract "does not explicitly address" conduct giving rise to unjust-enrichment claims). The availability of an adequate remedy at law (i.e., contract damages) precludes Plaintiffs' unjust-enrichment claim. Accordingly, the motion to dismiss is ALLOWED as to Count VII.

G.    Fraudulent Concealment (Count VIII)

Finally, Plaintiffs assert a claim of fraudulent concealment. Doc. No. 13 ¶¶ 191–201. Plaintiffs' opposition brief does not advance any argument to counter Dorel's challenges to this claim—a fact confirmed by counsel at oral argument. In any event, Dorel correctly argues that Plaintiffs have failed to plausibly allege that Dorel knew of the headrest defect prior to Plaintiffs' purchases, as required to state a claim for fraudulent concealment. Doc. No. 28 at 24 (citing Fed. R. Civ. P. 9(b); McCabe v. Ford Motor Co., 720 F. Supp. 3d 14, 27, 30 (D. Mass. 2024)). As explained above, "[t]he mere existence of some consumer complaints, without more, is not normally a sufficient basis from which to infer knowledge." McCabe, 720 F. Supp. 3d at 29. For these reasons, the motion to dismiss is ALLOWED as to Count VIII.

31

H.    Class Allegations

As an alternative to its motion to dismiss for failure to state a claim, Dorel moves under Rule 12(f) to strike the class allegations.  Doc. No. 28 at 25–28.  Only one claim survives the Court's resolution of the Rule 12(b)(6) motion—but Plaintiffs may seek leave to amend to cure the deficiencies in their other claims.  It would be premature to consider striking the class allegations in the present posture.  The motion to strike is DENIED WITHOUT PREJUDICE.

IV.    CONCLUSION

For the foregoing reasons, Dorel's Rule 12(b)(1) motion to dismiss the first amended complaint is DENIED.  Dorel's Rule 12(b)(6) motion to dismiss is DENIED with respect to Count II and otherwise ALLOWED.  Dorel's Rule 12(f) motion to strike the class allegations is DENIED WITHOUT PREJUDICE.

Plaintiffs may file a motion for leave to amend by September 3, 2026, limited to twenty pages.  They must explain why they should be allowed to amend under Rule 15(a)(2), including why their proposed second amended complaint fixes the pleading deficiencies identified herein.  The motion must also include, as attachments, the proposed second amended complaint and a red-lined comparison to their first amended complaint.

If Plaintiffs file such a motion, Dorel's response (also limited to twenty pages) is due twenty-one days later.  Dorel's opposition must include any Rule 12 arguments it seeks to advance against the proposed second amended complaint, in addition to any arguments why leave to amend should be denied.  Plaintiffs' reply (limited to five pages) is due ten days later.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

32